No. 2024-2153; 2024-2173

# United States Court of Appeals
# for the Federal Circuit

**LIONRA TECHNOLOGIES LTD.,**

*Appellant*

v.

**FORTINET, INC. AND CISCO SYSTEMS, INC.,**

*Appellee*

Appeal from the United States District Court for the Eastern District of Texas
in Nos. 2:23-cv-00206-JRG, 2:23-cv-00207-JRG

## APPELLANT LIONRA TECHNOLOGIES LTD.'S
## OPENING BRIEF

November 4, 2024

Brett Cooper
BC LAW GROUP, P.C.
200 Madison Avenue, 24th Floor
New York, NY  10016
Telephone: (516) 359-9668
bcooper@bclgpc.com

*Counsel for Appellant Lionra
Technologies Ltd.*

## **CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for the appellant, Lionra Technologies Ltd., certifies the following:

1.     The full names of every party represented by me are Lionra Technologies Limited, a corporation.

2.     The name of the real parties in interest are Lionra Technologies Limited.

3.     There are no parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the party represented by me.

4.     The names of all the law firms, partners and associates that appeared for the entities in the originating court or agency and have not entered an appearance in this Court are Drew Hollander, Seth Hasenour, and Jonathan Yim (BC Law Group, P.C.); and Kurt Truelove.

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal is: none.

6.     Any information required under Fed. R. App. P. 26.1(b) and 26.1(c): none

Dated:  November 4, 2024                          */s/ Brett Cooper*
                                                                   Brett Cooper

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................. i

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 1

   A.  Prior Litigation History ............................................................ 2

   B.  The Case at Bar ....................................................................... 3

SUMMARY OF ARGUMENT .............................................................. 4

ARGUMENT......................................................................................... 7

   I.  A Functional Element Cannot Be Satisfied by an Apparatus Alone .............. 7

   II.  The District Court Truncated the Claim Analysis to Just "Processor" and Failed to Analyze Whether the Intel Processor Is "Operable" as Required by the Asserted Claims ................................................................. 9

   III.  The Cisco Accused Products Infringe the Asserted Claims When Cisco Adds Its Software to the Intel Processor, Making It "Operable" ................. 12

   IV.  The Patent License Agreement Does Not Immunize the Intel Processor as Sold by Intel from Liability Under the Asserted Claims.......................... 13

CONCLUSION.................................................................................... 14

CERTIFICATE OF SERVICE ............................................................ 17

CERTIFICATE OF COMPLIANCE.................................................... 18

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) ................................................................. 8

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
  868 F.2d 1251 (Fed. Cir. 1989) ........................................................... 10

*Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,
  287 F.3d 1108 (Fed. Cir. 2002)............................................................. 8

*In re Varma*,
  816 F.3d 1352 (Fed. Cir. 2016) ....................................................... 8, 10

*Lionra Technologies Ltd. v. Fortinet, Inc., et al.*,
  No. 2:22-cv-0322-JRG-RSP (E.D. Tex.)...................... 2, 3, 4, 9, 10, 12

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
  704 F.3d 958 (Fed. Cir. 2013) ............................................................... 8

*Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*,
  822 F.2d 1528 (Fed. Cir. 1987) ........................................................... 11

## <u>Statutes</u>

28 U.S.C. § 1295.................................................................................... 1

28 U.S.C. § 1338.................................................................................... 1

28 U.S.C. §§ 1331.................................................................................. 1

## <u>Rules</u>

Fed. R. App. P. 4 .................................................................................... 1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment resolving all claims on July 1, 2024. Appx1-6. Lionra timely filed its notice of appeal on July 30, 2024. Fed. R. App. P. 4(a)(1); Appx854. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in granting summary judgment by summarily concluding that a generic processor as sold by a licensee supplier alone can satisfy a functional element in the Asserted Claims without the software provided by the defendant and required for the operations necessary to meet any such functional element(s).

## STATEMENT OF THE CASE

This case involves Lionra's patented technology, which relates to improvements in secure computing systems by addressing the need for enhanced access control lists allowing access of hosts in a computer network to be restricted or controlled. Appx18; Appx1105. Lionra is a technology licensing company headquartered in Ireland and asserts U.S. Pat. No. 7,623,518 ("'518 patent") against Cisco. Appx1105. The original assignee of the '518 patent was Hewlett-Packard Development Company, L.P., based in Houston, TX. Appx13. Based on the district court's prior ruling on the Patent License Agreement between RPX and Lionra,

Lionra was barred from identifying an Intel processor as a part of its infringement theories and, accordingly, entered a stipulated judgment of noninfringement, which Lionra now appeals.

## A.     Prior Litigation History

This is the second patent infringement lawsuit between Lionra and Cisco.  In the prior action captioned *Lionra Technologies Ltd. v. Fortinet, Inc., et al.*, No. 2:22-cv-0322-JRG-RSP (E.D. Tex.), Lionra asserted different patents against a similar set of Cisco accused products ("*Lionra I*").  After *Lionra I* proceeded through expert discovery, Cisco filed a motion for summary judgment of noninfringement on the basis that a Patent License Agreement between RPX and Lionra extinguished Lionra's claims against Cisco.  Appx714.  The district court granted the motion.  *Id.*; Appx751.  As Intel is an "Initial Licensee" under the Patent License Agreement, the district court found that the agreement's "Covenant Not to Sue" barred Lionra "from asserting a theory of infringement that identifies Intel . . . processors as the requisite hardware that is claimed." Appx719-20.  The district court similarly found the Intel processors to fall within the agreement's definition of "Combined Licensed Product and Service" in holding that "products incorporating Intel . . . processors are Licensed." Appx721-23.

Both the Patent License Agreement's Covenant Not to Sue and Combined Licensed Product and Service provisions require that a product satisfy an element or

step of a claim in a licensed patent in order to immunize against a claim of infringement asserted by Lionra.  Appx715; Appx2-3; Appx672-73; Appx678-79. As recited by the district court:

> "Combined Licensed Product and Service" means "any past, present or future combination or use, whether by an RPX Licensee, any RPX Licensee Affiliate, or any Covered Third Party, of a Licensed Product and Service with any other product, service, technology, or material, only if: (i) a portion of such Licensed Product and Service . . . <u>satisfies (or is alleged by Licensor or its Affiliates to satisfy), one or more material elements or steps of a claim in any Patent</u> . . ."

> Additionally, the Agreement provides a covenant not to sue: "neither Licensor nor any of its Affiliates will Assert or allege that any product, software, technology, material and/or service of any RPX Licensee or any RPX Licensee Affiliate <u>satisfies an element or step of a claim in any Patent</u> against any Entity."

Appx2-3 (emphasis added).

Lionra argued that defendant-provided software is required for the identified Intel processor to meet any claim element, but the district court rejected that argument as "not convincing."  Appx720.  As a result of this finding, Lionra dismissed its claims in *Lionra I*.

### B.    The Case at Bar

Prior to the summary judgment ruling in *Lionra I*, Lionra filed this second lawsuit against Cisco alleging infringement of the '518 patent, specifically claims 15, 17, 19, 20, and 21 ("Asserted Claims").  Appx1105; Appx1.  All of the Asserted Claims require "a processor coupled to the forwarding circuit and to the memory

circuit, the processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets." Appx4-5; Appx22.

Because of the sweeping nature of the district court's summary judgment ruling in *Lionra I*, Lionra and Cisco in the present case stipulated that Lionra would be similarly barred from identifying an Intel processor within Cisco's accused products as a part of its infringement theories. Appx1-6. The district court accordingly entered judgment of noninfringement in this case and expressly adopted the summary judgment opinion and briefing in *Lionra I* as part of the record for purposes of this appeal. Appx6.

## SUMMARY OF ARGUMENT

This appeal is taken to reverse the district court's usurpation of the role of the jury in determining factual issues concerning whether the accused functionality satisfies the limitations in Lionra's patent claims. Specifically, whether a processor as sold by a licensed supplier and as purchased by the defendant independently satisfies the claims at issue, which require that the processor be "operable" to perform specific functions. The district court declined to perform that analysis,

instead proceeding directly to the conclusion that the mere presence of a licensed processor extinguished all causes of action for accused products with Intel processors, including the Asserted Claims at issue here.    Lionra respectfully disagrees and requests that this Court reverse and remand for the case to proceed through fact and expert discovery, at which point a fact finder can then determine whether the licensed processors on their own can actually perform the claimed steps. Only then would the Patent License Agreement shield Cisco from liability. However, if the fact finder finds that the licensed processors as purchased by Cisco cannot perform the claimed steps without the addition of the accused Cisco software, then the Patent License Agreement would have no effect on Cisco's liability.

For purposes of this appeal, it is not necessary to decide the ultimate question of whether the subject processors as sold by Intel actually perform the claimed steps without Cisco-provided software.  That question was precluded by the district court's granting of summary judgment.  Instead, the district court simply held that the presence of any licensed item negated Lionra's infringement claims under the Patent License Agreement.  But that is not what the language of the agreement says.  The agreement specifically provides immunity from infringement claims where the licensed item "satisfies an element or a step of a claim" or "satisfies . . . one or more material elements or steps of a claim" with regard to Lionra's patents, including the

Asserted Claims.  The question for this Court thus is then how to define what a claim element or step is.

Claims 15, 19, 20, and 21 of U.S. Patent No. 7,623,518 ("Asserted Claims") all require more than simply a "processor."  Specifically, they require a "processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets."  Appx4-5.  This processor is no ordinary processor purchased off the shelf, rather it is a specific "processor operable" to perform a number of specific functions.  A processor that is not so configured is not the requisite "processor operable" to perform the claimed functionality.  There is no evidence that any processor sold by Intel has been specifically configured to operate as the Asserted Claims require.  Here, the district court's holding that reliance on an Intel processor, regardless of its actual capabilities at the time it is sold by Intel to Cisco or after implemented, would be licensed by the Patent License Agreement leads to the erroneous conclusion that the mere mention of "processor" in the Asserted Claims means that Cisco is licensed.

But the court's finding is insufficient to trigger coverage by the Patent License Agreement, and the district court's summary judgment of noninfringement should be reversed, with instructions for this case to be remanded for further proceedings.

## ARGUMENT

### I.     A Functional Element Cannot Be Satisfied by an Apparatus Alone

The sole issue on appeal is how to identify whether a generic processor sold by a Lionra licensee satisfies any claim element in the Asserted Claims such that Lionra's infringement claims are barred by the Patent License Agreement. Analyzing this question requires beginning with the pertinent language in the Asserted Claims.  It is undisputed that the Intel processor matches the "processor" in the Asserted Claims, but that the Asserted Claims involve more, specifically a "processor operable" to perform multiple functions:

> "operable to define the specific packets detected by the forwarding circuit";
>
> "operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit";
>
> "operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets."

Appx4-5.  The Asserted Claims do not simply claim a generic processor without added function.  This means the Asserted Claims' "processor operable" is a functional element.

7

A functional element requires proof that the apparatus can actually perform the function as claimed. *See, e.g.*, *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("as in every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred."). This Court has explained that "context matters" and reversed findings that do not properly attribute modifying language coming after a claim element's principal noun. *See In re Varma*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016). In *Varma*, the Court gave an example to illustrate the importance of identifying the complete extent of a functional claim element: "For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks." *Id.* at 1363. Reading out modifiers improperly broadens the scope of a claim element. *See Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (holding that district court "simply cannot read the qualifier 'help' out of the definition of 'help access window'").

This case most closely resembles the situation in *Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 967 (Fed. Cir. 2013), which turned on the claim element "executable applet," meaning that "the applet be executable or **<u>operable</u>** when it is generated and before it is first transmitted to the client, which means it must include both the particularized data and the functionality." *Id.* at 698

(emphasis added). It was undisputed that "each of the accused instrumentalities is missing at least one portion of the functional code or data when the applet is transferred to the client because the applet includes only a link." *Id.* Thus, the claim element necessarily included "executable" and not just "applet," requiring that the applet actually operate as disclosed. Here, the claim element requires that a processor be operable to perform a multitude of functions involving the processing of packets. Appx4-5. A processor alone does not suffice—whether from Intel or some other supplier.

## II.    The District Court Truncated the Claim Analysis to Just "Processor" and Failed to Analyze Whether the Intel Processor Is "Operable" as Required by the Asserted Claims

The Court's cases above demonstrate the importance of properly delimiting a claim element when analyzing whether that element is satisfied, which in this case is a "processor operable" to perform the specific functions listed above. The district court failed to properly delimit the claim element at issue when it found an Intel processor in the Cisco accused products "to satisfy the claimed 'processor' limitation" in the Asserted Claims. Appx4-5. This finding was based on the district court's summary judgment order in *Lionra I*, where it held that Intel processors "satisfy the hardware component" and that "[t]here is no reason why the hardware component of this limitation cannot be considered an 'element or step of a claim.'" Appx720. The district court therefore conducted no analysis as to whether software

9

supplied by defendant[1] Cisco was required to enable the Intel processor to satisfy this functional claim element.  *Id.*

The district court thus erroneously read out the functional or "operable" modifying clauses and failed to heed this Court's instruction that "context matters" in analyzing claim limitations.  *Varma*, 816 F.3d at 1362-63.  It was, however, candid in "noting that 'element' in this context is not a precise term."  Appx722.  This admission of uncertainty as to how to properly analyze whether the Intel processor satisfies any element in the Asserted Claims demonstrates sufficient error to warrant reversal.

To be sure, the district court did seek some guidance in proposing that "element" "generally refers to any limitation of a claim, in other words any requirement of the claim."  Appx722.  The case cited for that proposition, however, does not say that an element can by "any requirement of the claim."  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259-60 (Fed. Cir. 1989).  *Corning Glass Works* discussed the meaning of claim element within the context of the "All Elements" rule for the doctrine of equivalents, which is not at issue here.  *Id.* at 1259.  Indeed, as a part of that discussion, a footnote in *Corning Glass Works*

---

[1] The district court's summary judgment order in *Lionra I* occasionally names only one defendant (such as Fortinet, which has since reached an agreement with Lionra and has been dismissed from this appeal), but the order makes clear that it applies to all applicable defendants, including Cisco.

contains a partial quotation noting that "[r]eferences to 'elements' can be misleading." *Id.* at 1259 n.5. (quoting *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 n.9 (Fed. Cir. 1987)). Further quotation from the cited *Perkin-Elmer* case in turn provides guidance pertinent to the issue at hand:

> It is the *limitation* of a claim that counts in determining both validity and infringement, and a limitation may include descriptive terms (*e.g.*, "tapped into the coil at a point near, but spaced from, the grounded end thereof" in clause (h)). Because claims are composed of a number of limitations, the limitations have on occasion been referred to as "claim elements" or "elements of the claim," but clarity is advanced when sufficient wording is employed to indicated when "elements" is intended to mean a component of an accused device or an embodiment of an invention and when it is intended to mean a feature set forth in or as a limitation in a claim.

*Perkin-Elmer*, 822 F.2d at 1533 n.9 (emphasis in original).

Thus, the district court's concern about the lack of precision regarding how to interpret the claim language to delimit an "element" is available: if the inquiry concerns "elements of the claim," then the focus is on a limitation of a claim, "and a limitation may include descriptive terms (*e.g.*, 'tapped into the coil at a point near, but spaced from, the grounded end thereof' in clause (h))." *Id.* And here, the Patent License Agreement's relevant portions uniformly mention "element" only as part of the phrase "elements or steps of a claim" or "element of any claim" or "element or step of a claim." Appx3. Therefore, the district court should have analyzed "element" as a claim limitation, meaning that it should have included any modifying "descriptive terms" as a part of its analysis. *See Perkin-Elmer*, 822 F.2d at 1533 n.9.

Here, that means the proper analysis focuses on "processor operable," not "processor" alone.

### III.     The Cisco Accused Products Infringe the Asserted Claims When Cisco Adds Its Software to the Intel Processor, Making It "Operable"

In view of the proper analysis that the district court should have undertaken, there is no evidence in the record to support the finding that the Intel processors as sold by Intel to Cisco are:

> "operable to define the specific packets detected by the forwarding circuit";
>
> "operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit";
>
> "operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets."

Appx4-5. After the district court's summary judgment ruling in *Lionra I*, the parties in this case stipulated to judgment to facilitate a timely appeal. Thus, this case did not proceed to the expert report stage. However, in *Lionra I*, Lionra provided evidence to support the finding that only after Cisco has obtained the processors from Intel that Cisco loads them with software to be able to operate as required by the Asserted Claims.[2]

---

[2] This evidence cited in opposition to Cisco's motion for summary judgment in *Lionra I* forms a proper part of the record for appeal in this case. Appx6.

As stated in Lionra's opposition to Cisco's motion for summary judgment in *Lionra I*, "Lionra has consistently maintained that the claim terms at issue are satisfied only by the *running of Cisco's software* on the general-purpose Intel . . . processors" and cited the deposition testimony of its infringement expert Dr. Hugh Smith in support thereof. Appx203 (citing Appx184-87). Moreover, Dr. Smith relied on the testimony of Cisco's Rule 30(b)(6) corporate representative (Mr. Jeremy Felix) in determining that it is Cisco's own software running on the processor purchased from Intel that implements the accused functionality, not any software supplied by Intel. Appx187. Cisco's own motion for summary judgment concedes that it is Cisco's own software that is the focus of Lionra's infringement allegations, not any software provided by Intel. Appx118.

## IV.    The Patent License Agreement Does Not Immunize the Intel Processor as Sold by Intel from Liability Under the Asserted Claims

Given that the Intel processors as sold by Intel to Cisco do not contain the Cisco software that implements the accused functionality, the Intel processors themselves cannot satisfy any element or step of the Asserted Claims as found by the district court. The district court's finding that the Patent License Agreement immunizes Cisco from claims of infringement requires that an Intel processor alone satisfy an "element or step of a claim." Appx719-22. The district court therefore

erred in holding that a Cisco product that contains an Intel processor is licensed under the Patent License Agreement.  Appx6.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of noninfringement and remand for further proceedings.

Dated:  November 4, 2024                    Respectfully submitted,

                                            */s/Brett Cooper*
                                            Brett E. Cooper
                                            bcooper@b-clg.com
                                            **BC LAW GROUP, P.C.**
                                            200 Madison Avenue, 24th Floor
                                            New York, NY 10016
                                            Phone: (516) 359-9968

                                            ***Attorneys for Appellant Lionra
                                            Technologies Ltd.***

# ADDENDUM

## TABLE OF CONTENTS TO ADDENDUM

Order dated July 1, 2024 ………………………….............................................. Appx1

U.S. Patent No. 7,623,518 …........................................................................Appx22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| LIONRA TECHNOLOGIES LTD. | § | |
| | § | |
| v. | § | CASE NO. 2:24-cv-00206-JRG |
| | § | (Member Case) |
| FORTINET, INC. | § | |

| | | |
|---|---|---|
| LIONRA TECHNOLOGIES LTD. | § | |
| | § | |
| v. | § | CASE NO. 2:23-cv-00207-JRG |
| | § | (Member Case) |
| CISCO SYSTEMS, INC. | § | |

**<u>ORDER</u>**

Before the Court is the parties' Joint Stipulation of Non-Infringement of U.S. Patent No. 7,623,518 (Dkt. No. 55) (the "Stipulation").  In the Stipulation, the parties agree and stipulate to the following facts:

1. Lionra has asserted infringement of claims 15, 17, and 19–21 of the '518 patent (the "Asserted Claims") by Cisco's "Accused Products" or "Accused Instrumentalities" (collectively, the "Accused Products").[1] Each of the Accused Products includes a processor made by Intel Corporation ("Intel Processor").

---

[1] Lionra and Cisco agree that for purposes of this stipulation, Lionra will discontinue assertion of method claims 1 and 3 without prejudice to reassert the claims should the District Court's determinations be reversed.

2. Lionra is a signatory of a Patent License Agreement with RPX Corporation (the "RPX Agreement"), attached hereto as Exhibit 1. The RPX Agreement is a valid and enforceable contract.

3. The RPX Agreement provides an "exclusive and irrevocable right of RPX to grant to each Initial Licensee: (i) sublicenses under the Patent License, as well as (ii) an irrevocable, unconditional release from all Claims relating to any Patent including those for damages for past, present and future infringement of the Patents." Ex. 1 at § 1.2(a).

4. The RPX Agreement further defines a "Licensed Product and Service" as follows:

> **"Licensed Product and Service"** shall mean any past, present or future product (including but not limited to integrated circuits, components, systems, devices, software, firmware, IP blocks, cores, cells or macros), service, software, technology, design, or material, hardware, systems, apparatuses, devices, components, methods, websites, and processes (including any components, devices, data, media, or any other portions thereof), at any time, made, have made, used, purchased, provided, hosted, sold, leased, licensed, distributed, transmitted, exported, imported or offered for sale, lease, import, or otherwise disposed of or exploited by or on behalf of an RPX Licensee or an RPX Licensee Affiliate, alone or in combination with other products, software, technology, materials and services, the manufacture, use, purchase, provision, hosting, sale, lease, license, distribution, transmittal, export, import (or offer for sale, lease or import) of which would result in infringement (direct, indirect, or otherwise) of one or more Patents, irrespective of whether the product, service, software, technology, or material, hardware, systems, apparatuses, devices, components, methods, websites, and processes (including any components, devices, data, media, or any other portions thereof) were or had been made, used, purchased, provided, hosted, sold, leased, licensed, distributed, transmitted, exported, imported or offered for sale, lease, or import in the United States. Licensed Product and Service will include any Combined Licensed Product and Service.

*Id.* at 2-3.

5. The Patent License Agreement further defines "Combined Licensed Product and Service" as follows:

> **"Combined Licensed Product and Service"** shall mean any past, present or future combination or use, whether by an RPX Licensee, any RPX Licensee Affiliate, or any Covered Third Party, of a Licensed Product and Service with any other product,

service, technology, or material, only if: (i) a portion of such Licensed Product and Service provided by or on behalf of the RPX Licensee or any RPX Licensee Affiliate satisfies (or is alleged by Licensor or its Affiliates to satisfy), one or more material elements or steps of a claim in any Patent, or (ii) the RPX Licensee or any RPX Licensee Affiliate has a legal or contractual obligation (existing on or after the Effective Date of this Agreement) to indemnify a third party with respect to the Licensed Product and Service in the combination such that the RPX Licensee or any RPX Licensee Affiliate would be subject to a claim for indemnification in the event that the combination is alleged to infringe or practice any element of any claim in any Patent (provided that any contractual obligation to indemnify (a) is not frivolous and not for the primary purpose of obtaining rights under this Agreement, and (b) arising after the Effective Date will only cover acts or activities occurring on or after the date of such contractual obligation).

*Id.* at 1-2.

6. The RPX Agreement contains a covenant not to sue, providing:

[A]s of and following the Closing, neither Licensor nor any of its Affiliates will Assert any Patent (or instruct, encourage, or aid a third party to Assert any Patent) against any RPX Licensee or any RPX Licensee Affiliate, and neither Licensor nor its Affiliates will Assert any Patent (or instruct, encourage, or aid a third party to Assert any Patent) against any Covered Third Party with respect to any Licensed Product and Service or Combined Licensed Product and Service. As of and following the Closing, neither Licensor nor any of its Affiliates will Assert or allege that any product, software, technology, material and/or service of any RPX Licensee or any RPX Licensee Affiliate satisfies an element or step of a claim in any Patent against any Entity.

*Id.* at § 3(d).

7. The RPX Agreement defines "Initial Licensee" as follows:

**"Initial Licensee"** shall mean each Entity identified in Exhibit A, together with each such Entity's past, present and future Affiliates and any portion of its business or assets (including any Affiliate) that any of the foregoing may sell, transfer or divest (subject to Section 1.3).

*Id.* at 2.

8. Intel Corporation is an enumerated "Initial Licensee." RPX Agreement, Exhibit A at 2. Cisco, as a "Covered Third Party," can enforce Lionra's obligations under the RPX Agreement at least pursuant to Section 1.2(c). *Id.* at § 1.2(c).

9. Claim 15 of the '518 patent requires, in part, "a processor coupled to the forwarding circuit and to the memory circuit, the processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets." For all Accused Products, Lionra's only infringement accusation for this limitation is that an Intel Processor is alleged to satisfy the claimed "processor" limitation. Thus, Lionra's accusations indicate that an Intel Processor is a "material element[]" within the contemplated scope of the RPX Agreement for "Licensed Product[s] and Service[s]." Claim 17 of the '518 patent depends on claim 15, and therefore includes the same "processor" limitation. For all Accused Products, Lionra's only infringement accusation for this limitation is that an Intel Processor is alleged to satisfy the claimed "processor" limitation.

10. Claim 19 of the '518 patent requires, in part, "a processor coupled to the forwarding circuit and to the memory circuit, the processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets." For all Accused Products, Lionra's only infringement accusation for this limitation is that an Intel Processor is alleged to satisfy the claimed "processor" limitation.

11. Claim 20 of the '518 patent depends on claim 19, and therefore includes the same

"processor" limitation. For all Accused Products, Lionra's only infringement accusation for this limitation is that an Intel Processor is alleged to satisfy the claimed "processor" limitation.

12. Claim 21 of the '518 patent depends on claim 19, and therefore includes the same "processor" limitation. For all Accused Products, Lionra's only infringement accusation for this limitation is that an Intel Processor is alleged to satisfy the claimed "processor" limitation.

13. Cisco maintains that Lionra's assertion of infringement of the Asserted Claims in this case is contrary to the license and covenant not to sue under the RPX Agreement. Lionra disputes that. The parties' contentions on this dispute are fully set forth at Dkts. 264, 300, 333, 374, and 507 in *Lionra Technologies Ltd. v. Fortinet, Inc. et al.*, No. 2:22-cv-00322-JRG-RSP (E.D. Tex.) ("*Lionra I*").

14. The Court decided in *Lionra I* that certain Cisco products are "Licensed Product[s] and Service[s]" and "Combined Licensed Product[s] and Service[s]" under the RPX Agreement as to U.S. Patent No. 7,685,436 and U.S. Patent No. 8,566,612, by virtue of their including Intel Processors as a "material element" of the asserted claims. *Lionra I*, Dkt. 479 at 6–7 (Report and Recommendation); *Lionra I*, Dkt. 515 (Order Adopting Report and Recommendation).

15. The Court also decided in *Lionra I* that, under the covenant not to sue in the RPX Agreement, Lionra is barred from asserting a theory of infringement that identifies an Intel processor "as the requisite hardware that is claimed" in the relevant asserted claims. *Lionra I*, Dkt. 479 at 6–7 (Report and Recommendation); *Lionra I*, Dkt. 515 (Order Adopting Report and Recommendation).

16. The parties stipulate that the Court's reasoning in *Lionra I* applies equally to the Asserted Claims and Accused Products in this case.

17. Accordingly, the parties stipulate that, under the Court's reasoning in *Lionra I*, Cisco's Accused Products are licensed under the RPX Agreement for the reasons stated above.

18. The parties further stipulate that, under the Court's reasoning in *Lionra I*, Lionra has covenanted not to sue any entity, including Cisco, for alleged infringement based on any allegations against Intel processors.

19. Accordingly, the parties stipulate that, under the Court's reasoning in *Lionra I*, Cisco is entitled to judgment of noninfringement in this case, subject to Lionra's right to appeal the judgment based on the Court's reasoning in *Lionra I*, Dkt. 515.

20. For the avoidance of doubt, the parties' briefing regarding the motion for summary judgment in *Lionra I* (Dkts. 264, 300, 333, 374, 507) and this Court's decisions on that motion (Dkts. 479, 515) are attached hereto and will be considered part of the record of this case for purposes of any appeal. *See* Exs. 2-8.

Having considered the Stipulation, and noting its joint nature, the Court **ACKNOWLEDGES AND ACCEPTS** the Stipulation.  Accordingly, the Court hereby **ORDERS** and **ENTERS** a judgment of non-infringement as to U.S. Patent No. 7,623,518 ("the '518 patent").

**So ORDERED and SIGNED this 1st day of July, 2024.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE



US007623518B2

(12) **United States Patent**

Faulk, Jr.

(10) **Patent No.:** **US 7,623,518 B2**

(45) **Date of Patent:** **Nov. 24, 2009**

(54) **DYNAMIC ACCESS CONTROL LISTS**

(75) Inventor: **Robert L. Faulk, Jr.**, Roseville, CA (US)

(73) Assignee: **Hewlett-Packard Development Company, L.P.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 952 days.

(21) Appl. No.: **10/822,048**

(22) Filed: **Apr. 8, 2004**

(65) **Prior Publication Data**

US 2005/0259654 A1    Nov. 24, 2005

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 12/28* | (2006.01) |
| *G06F 15/173* | (2006.01) |
| *H04L 29/06* | (2006.01) |

(52) **U.S. Cl.** ........................ **370/392**; 370/352; 370/391; 370/396; 370/401; 370/431; 709/225; 709/232; 709/250; 713/152

(58) **Field of Classification Search** ......... 370/352–431; 709/225–250, 152
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,219,706 | B1 * | 4/2001 | Fan et al. | 709/225 |
| 6,345,294 | B1 * | 2/2002 | O'Toole et al. | 709/222 |
| 6,463,474 | B1 * | 10/2002 | Fuh et al. | 709/225 |
| 6,697,330 | B1 * | 2/2004 | Melvin et al. | 370/235 |
| 6,757,323 | B1 * | 6/2004 | O'Toole et al. | 709/222 |
| 6,957,276 | B1 * | 10/2005 | Bahl | 709/245 |
| 6,973,488 | B1 * | 12/2005 | Yavatkar et al. | 709/223 |
| 7,143,435 | B1 * | 11/2006 | Droms et al. | 726/3 |
| 7,249,175 | B1 * | 7/2007 | Donaldson | 709/225 |
| 7,249,374 | B1 * | 7/2007 | Lear et al. | 726/6 |
| 2003/0088520 | A1 * | 5/2003 | Bohrer et al. | 705/74 |
| 2004/0123150 | A1 * | 6/2004 | Wright et al. | 713/201 |
| 2004/0193918 | A1 * | 9/2004 | Green et al. | 713/201 |
| 2005/0055578 | A1 * | 3/2005 | Wright et al. | 713/201 |
| 2006/0005254 | A1 * | 1/2006 | Ross | 726/27 |
| 2006/0052085 | A1 * | 3/2006 | Gregrio Rodriguez et al. | 455/411 |
| 2006/0059348 | A1 * | 3/2006 | Girard et al. | 713/176 |
| 2007/0183416 | A1 * | 8/2007 | Gooch et al. | 370/389 |
| 2007/0211626 | A1 * | 9/2007 | Gooch et al. | 370/229 |

* cited by examiner

*Primary Examiner*—Ayaz R Sheikh
*Assistant Examiner*—Venkatesh Haliyur

(57) **ABSTRACT**

A method controls access of a user to a network including a plurality of hosts coupled together through a network switch. The method includes storing in the network switch an enhanced access control list containing data related to at least one of user names, DNS names, domain names, and physical addresses. A dynamic access control list is generated from the enhanced access control list, with the dynamic access control list containing a plurality of IP addresses that restrict access of the user to the network.

**22 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2



**FIG. 3**

US 7,623,518 B2

1

**DYNAMIC ACCESS CONTROL LISTS**

BACKGROUND OF THE INVENTION

In an Ethernet local area network (LAN), computers or hosts are attached to the network and each host is uniquely identified by a physical address which is designated a media access control (MAC) address in an Ethernet network. The MAC address of each host is typically hardwired into an Ethernet network interface card in the host. The network interface card in each host transmits and receives Ethernet packets to communicate with the other hosts in the network. Each Ethernet packet includes an address segment including the MAC address of the host to receive the packet (destination MAC address) along with the MAC address of the host sending the packet (source MAC address), and further includes a data segment, as will be understood by those skilled in the art. The MAC address of each host is utilized by Ethernet switches in the network to receive and forward Ethernet packets between hosts. More specifically, a switch receives an Ethernet packet from a source host, examines the destination MAC address portion of the packet to determine where to forward the packet, and forwards the packet to the host corresponding to the destination MAC address.

In many situations, an Ethernet network must communicate with hosts outside the network and in different types of networks. For example, a user of a host in an Ethernet network may want to access various Web sites and Web pages contained on the Internet. To communicate with other types of networks, the host utilizes the Internet Protocol (IP) which allows hosts in many different types of networks to communicate with each other through IP packets. Within the Ethernet network, each host must be assigned an IP address by a network administrator for the purpose of communicating with computers outside the network via the Internet Protocol. Devices known as routers operate to forward IP packets from one network to another utilizing the IP addresses contained in the IP packets being communicated.

A router typically includes an access control list (ACL) to restrict or define the hosts with which a given host is allowed to communicate. For example, in an Ethernet network within a company, the hosts of employees may be restricted from communicating with certain Web sites. In this way, access control lists are utilized as a tool for network security to define or control the hosts and other objects, such as files and directories, with which a given host can communicate. For example, IP packets from a particular IP network or a particular Web site may be restricted from being received by hosts in the Ethernet network. In this situation, the access control list on the router would contain a field indicating that IP packets from the IP address corresponding to this Web site are to be denied, meaning that any such packets received by the router will not be forward to the intended host in the Ethernet network. IP packets include source and destination IP addresses, with the source IP address corresponding to the IP address of the host that sent the packet and the destination IP address corresponding to the host that is to receive the packet.

In an Ethernet network, there are two ways for a network administrator to assign IP addresses to hosts in the network. First, the network administrator can manually enter an IP address into a configuration file that is stored on each host. With large networks, this approach is typically not practical due to the amount of time it would take to configure all the hosts. As a result, the second approach that may be used is the configuration of a dynamic host configuration protocol (DHCP) server. The DHCP server operates to automatically assign IP addresses to hosts requesting an IP address instead

2

of requiring the network administrator to manually assign such addresses. Typically, the DHCP server has a pool of available IP addresses that are assigned to requesting hosts as needed. When using a DHCP server to automatically assign IP addresses, the IP address for a given Ethernet host can change depending on the available IP addresses in the pool at the time the host requests the IP address. The use of a static ACL on a router to control access for a given Ethernet host does not work when a DHCP server is utilized since the IP address of the host is not static but changes over time. As a result, the static ACL having a set IP address for a given host does not allow the ACL to control access for that host when an IP address assigned to the host by the DHCP server is different than the IP address contained in the ACL.

In an Ethernet network, a user must typically log onto a host in the network to gain access to the network and other host coupled to the network. This is typically done through a centralized authentication server which authenticates the credentials of a particular user. For example, in a Microsoft Windows environment a Windows NT Domain Login is utilized to authenticate the credentials of a user before allowing that user access to the network via his host. A domain defines a group of computers and devices on a network that are administered as a unit with common rules and procedures, and a user provides a Windows NT Domain Login in the form of a user name and password to gain access to or log into the network. Another example is the login procedure utilized where an IEEE 802.11 wireless device wants to communicate with an Ethernet network. In this situation, the wireless device communicates login information to an Ethernet switch that also functions as an access point for the device to access the network, and the switch, in turn, communicates with a remote access and dial-in user service (RADIUS) server to verify the credentials of the user.

In some networks, there is no login procedure and user information is inferred directly from the MAC address of the host. Note that as used herein, the term host includes any type of electronic device that may be coupled to the network, such as a computer system, IP telephone, or personal digital assistant (PDA). For example, if a user "John Doe" has an IP telephone that begins sending Ethernet packets to the Ethernet network, then this IP telephone will be recognized using John Doe's Ethernet MAC address assigned to the telephone. A network administrator must configure the network in advance to define the MAC address for the IP telephone as a valid address within the network. Note that a user may log into the network on a number of different hosts and thus can have multiple MAC and IP addresses that will change as the user logs onto the network through different hosts. In many situations, access to resources within the network would ideally be restricted based upon user information regardless of the host through which the user is attempting to access the network.

In a network that communicates through the IP protocol, hosts are identified not only by their IP address but also by a "domain name" that is utilized instead of the IP address. As will be appreciated by those skilled in the art, a domain name such as "www.hp.com" may be registered with Internet domain name registration authorities to provide a plain English name that is easily remembered and recognized by users. Domain name system (DNS) servers contained in the Internet convert the domain name into a corresponding IP address which allows a host to communicate with a desired host corresponding to that IP address. There may be multiple IP addresses associated with a single domain name, and thus once again the use of a conventional ACL based upon a single IP address will not adequately restrict communication

US 7,623,518 B2

**3**

between a source host and destination host unless the ACL includes all such IP addresses. In the following description, the term "DNS name" will be used to refer to the domain name utilized by DNS servers and having an associated IP address, and the term "domain name" will be used to refer to groups of hosts in an Ethernet network that are administered as a unit such as a Windows NT domain name. Although the above examples are described with reference to an Ethernet network, the concepts of principles of the present invention may be applied to other types of networks, as will be appreciated by those skilled in the art.

There is a need for access control lists that allows access of hosts in a computer network such as an Ethernet network to be restricted or controlled based upon user names, MAC addresses, domain names, and DNS names instead of merely IP address information.

### SUMMARY OF THE INVENTION

According to one aspect of the present invention, a method controls access of a user to a network including a plurality of hosts coupled together through a network switch. The method includes storing in the network switch an enhanced access control list containing data related to at least one of user names, DNS names, domain names, and physical addresses. A dynamic access control list is generated from the enhanced access control list, with the dynamic access control list containing a plurality of IP addresses that restrict access of the user to the network.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a functional block diagram of an Ethernet network including an Ethernet switch that utilizes a dynamic access control list to restrict the access of computers in the network according to one embodiment of the present invention.

FIG. **2** is a functional flow diagram illustrating the process executed by the Ethernet switch of FIG. **1** in generating a dynamic access control list according to one embodiment of the present invention.

FIG. **3** is more detailed functional block diagram of the Ethernet switch of FIG. **1** according to one embodiment of the present invention.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. **1** is a functional block diagram of an Ethernet network **100** including an Ethernet switch **102** that utilizes a dynamic access control list **104** to restrict the access of users to hosts **106***a-n* in the network according to one embodiment of the present invention. In operation, the switch **102** generates the dynamic access control list **104** containing IP addresses currently being utilized by various users of the network **100**, and utilizes the dynamic access control list **104** to restrict the access of such users to hosts **106***a-n* in the network. In generating the dynamic access control list, the switch **102** utilizes an enhanced access control list **108** containing IP address, user name, DNS name, Windows domain name, and MAC address information for the users and hosts **106***a-n* of the network **100**. The switch **102** uses the information contained in the enhanced access control list **108** to determine current IP addresses for users accessing the network **100** and for hosts **106***a-n* requesting such IP address, and then stores the determined IP addresses in the dynamic access control list **104** to control the access of users and hosts to the network based

**4**

upon the IP addresses in the dynamic access control list, as will be explained in more detail below.

In this way, the switch **102** allows user access to the network **100** to be controlled regardless of the host **106***a-n* through which the user is accessing the network and allows access to be controlled based upon IP address, user name, DNS name, Windows domain name, and/or MAC address information instead of merely static IP address information. Moreover, the switch **102** can be utilized in networks **100** containing a DHCP server (not shown) that dynamically allocates IP addresses to the hosts **106***a-n* since the dynamic access control list **104** will contain the current IP address assigned to each host by the DHCP server.

In the following description, certain details are set forth in conjunction with the described embodiments of the present invention to provide a sufficient understanding of the invention. One skilled in the art will appreciate, however, that the invention may be practiced without these particular details. Furthermore, one skilled in the art will appreciate that the example embodiments described below do not limit the scope of the present invention, and will also understand that various modifications, equivalents, and combinations of the disclosed embodiments and components of such embodiments are within the scope of the present invention. Embodiments including fewer than all the components of any of the respective described embodiments may also be within the scope of the present invention although not expressly described in detail below. Finally, the operation of well known components and/or processes has not been shown or described in detail below to avoid unnecessarily obscuring the present invention.

In the network **100**, the hosts **106***a-n* are coupled to ports P1-PN, respectively, of the Ethernet switch **102**, and the switch forwards Ethernet packets from a source host (a host sending a packet) to a destination host (a host to which the packet is directed). More specifically, the switch **102** examines the destination MAC address portion of each received Ethernet packet and forwards the packet to the host **106***a-n* corresponding to the destination MAC address. This corresponds to the conventional operation of an Ethernet switch. In addition to the conventional operation of forwarding and receiving Ethernet packets, the switch **102** also determines whether each Ethernet packet is from a new host **106***a-n* on the port P1-PN. If the source MAC address of the new host is not in an address table of the switch **102**, or is in the address table on a different port, the switch will recognize the new source MAC address.

The switch **102** also determines whether each Ethernet packet from a host **106***a-n* is a "login packet." Login packets are sent by a host **106***a-n* when a user is first attempting to access the network **100** through that host. Login packets convey the user name and password data for the user, and also includes the source MAC address of the host **106***a-n* the user is utilizing to access the network. A login request will be directed to an authentication server, which is not expressly shown in FIG. **1** but which corresponds to one of the hosts **106***a-n*. The switch **102** also detects the login acknowledge packets being returned from the authentication server for the originating host **106***a-n* in response to the login request. The switch **102** determines whether the user has been granted access from the login acknowledge packets, and if the user has been granted access the switch **102** associates the user name with the MAC address of the host **106***a-n* the user is utilizing. The switch **102** stores this association as an entry or record in a mapping state database **110**, with the record con-

US 7,623,518 B2

**5**

taining the user name and the MAC address corresponding to the host **106a-n** the user is currently using to access the network **100**.

The switch **102** also detects all dynamic host configuration protocol (DHCP) packets sent by any of the hosts **106a-n**. A host **106a-n** sends DHCP packets to a DHCP server, which although not shown in FIG. **1**, would correspond to one of the hosts to thereby obtain an IP address when required, such as when the host is going to access the Internet. The DHCP packets will contain a source MAC address corresponding to the host **106a-n** that sent the DHCP packets and thus the host that is requesting the IP address. The switch **102** then monitors the return DHCP packets from the DHCP server sent in response to the DHCP packets, and from these return DHCP packets determines the IP address assigned to the host **106a-n** requesting the IP address. At this point, the switch knows the IP address assigned to a particular MAC address.

Since prior to sending the DHCP packet the host **106a-n** being used by the user would have previously sent a login packet, the mapping state database **110** will at this point contain a record indicating a user name associated with the MAC address of the host **106** that just requested the IP address. As a result, the switch **102** at this point has determined an IP address associated with a particular MAC address which, in turn, is associated with a particular user. The enhanced access control list **108** also includes rules or access privileges for each user (i.e., user name), and the switch **102** applies these rules to generate a corresponding entry or record in the dynamic access control list **104** for the user. The switch **102** thereafter applies the dynamic access control list **104** to control the access of the user to resources in the network **100**, such as other hosts **106a-n**, files, directories, Web sites, and so on.

As previously mentioned, the enhanced access control list **108** may include DNS names. The switch **102** uses such DNS names to generate additional IP address records in the dynamic access control list **104** to limit user access to specific Web sites, for example, as will be explained in more detail below. Briefly, the switch **102** uses the DNS name in the enhanced access control list **108** to obtain an IP address corresponding to the DNS name, and then utilizes this IP address in the dynamic access control list **104** to restrict a users access to the IP address corresponding to this DNS name. The same is true of Windows domain names contained in the enhanced access control list **108**, as will also be explained in more detail below.

The switch **102** utilizes any IP addresses contained in the enhanced access control list **108** to generate corresponding entries in the dynamic access control list **104**. Also note that the enhanced access control list need not include all of the indicated name and address information, but may include any subcombination of these information elements depending on the needs of the network **100**. For example, the enhanced access control list **108** may include only IP address, MAC address, and user name information elements.

FIG. **2** is a functional flow diagram illustrating the steps executed by the Ethernet switch **102** of FIG. **1** in generating the dynamic access control list **104** according to one embodiment of the present invention. The dynamic access control list **104**, enhanced dynamic access control list **108**, and mapping state database **110** previously discussed with reference to FIG. **1** are shown in FIG. **2**. The overall process executed by the Ethernet switch **102** includes three subprocesses: 1) a user name monitoring and conversion subprocess **200**; 2) a DNS name monitoring and conversion subprocess **202**; and 3) a DHCP monitoring and MAC conversion subprocess **204**. These subprocesses operate in combination to apply the rules

**6**

contained in the enhanced access control list **108** to generate the mapping state database **110** and dynamic access control list **104**, as will now be described in more detail.

In operation, the user name monitoring and conversion subprocess **200** converts user names into either MAC or IP addresses depending upon the manner in which a user is attempting to log into the network **100**. When a user is attempting to log into the network **100** using a host **106** (FIG. **1**) that communicates through the IEEE 802.1x standard, the host being utilized by the user will communicate login packets to the network **100**. The IEEE 802.1x standard defines a group of communications protocols through which devices communicate with a local area network such as the network **100**, as will be appreciated by those skilled in the art. The login packets will include a user name and password along with a MAC address associated with the host. **106** being utilized by the user. The subprocess **200** monitors a login reply packet sent by the network **100** to the host **106** being utilized by the user in response to the login packet to determine whether the user has been granted access to the network. When the subprocess **200** determines the user has been granted access, the subprocess associates the user name from the login packets with the MAC address of the host **106** being utilized by the user and stores this information as a record in the mapping state database **110**. In this way, the subprocess **200** maps user names to MAC addresses when a user is accessing the network **100** with a host **106** that communicates via the IEEE 802.1x protocol. If the MAC address is new and thus not currently stored in the mapping state database **110**, the subprocess **200** also supplies the MAC address to the DHCP monitoring and MAC conversion subprocess **204** for determination of the IP address associated with the new MAC address, as will be described in more detail below.

The user name monitoring and conversion subprocess **200** also operates to determine an IP address associated with a particular user name when a user is attempting to access the network **100** using a Windows host **106**. More specifically, when hosts **106** in the network **100** run the Windows operating system, a Windows domain controller, which corresponds to one of the hosts, is responsible for granting or denying access of a user to the network. To access the network **100**, a host **106** being utilized by the user and the host functioning as the domain controller communicate server message block (SMB) login packets. Each SMB login packet includes a user name associated with the user and a computer name associated with the host **106** being utilized by the user. In response to the SMB login packet, the domain controller will supply a SMB login reply packet to the host **106** being utilized by the user, and this packet will include an IP address assigned to the host being utilized by the user. This reply packet will also contain information either granting or denying the user access to the network **100**. If the user is granted access to the network **100**, the subprocess **200** will associate the IP address contained in the SMB login reply packet with the user name and apply the rules from the enhanced access control list **108** for this user name to generate corresponding records in the dynamic access control list **104**. Note that if the presently determined IP address associated with the user name is different from an IP address for that user name previously stored in the dynamic access control list **104**, both the new and the previous IP address(es) are stored for the user. This allows one Enhanced ACL entry to be created which is applied to all of the hosts **106** that the user has logged into, simultaneously.

It should be noted that the user name data contained in a SMB login packet is encrypted, and thus the subprocess **200** must have access to the corresponding encryption key in

**7**

order to decrypt this data and obtain the user name. If the encryption key is not available, then the subprocess 200 could associate the computer name contained in the SMB login packet, which is not encrypted, with the IP address contained in the SMB login reply packet and store this information in the mapping state database 110.

The DNS name monitoring and conversion subprocess 202 operates to determine DNS names corresponding to IP addresses contained in packets being communicated over the network 100. More specifically, the subprocess 202 detects all Ethernet packets being communicated through the switch 102 (FIG. 1) having a source IP address which does not yet exist in the mapping state database 110. As will be appreciated by those skilled in the art, all packets being communicated over the network 100 are Ethernet packets when the network is an Ethernet network. In this situation, however, IP packets are contained within these Ethernet packets when the IP protocol is being utilized, with this nesting of packets of a particular protocol within packets of another protocol typically being referred to as a protocol stack, as will be understood by those skilled in the art. Accordingly, the subprocess 202 can detect all unknown source IP addresses contained in packets being communicated through the switch 102.

When the subprocess 202 detects an unknown source IP address, the subprocess generates a reverse DNS lookup query containing the source IP address, and sends this query to a DNS server. In response to the reverse DNS lookup query, the DNS server determines a DNS name corresponding to the source IP address and returns this DNS name to the switch 102. The subprocess 202 then stores the DNS name associated with this particular source IP address in the mapping state database 110 and applies the rules of the enhanced access control list 108 to develop a corresponding record for the dynamic access control list 104. It should be noted that there may be multiple records in the enhanced access control list 108 for a given DNS name. As a result, the subprocess 202 may develop a number of corresponding records for the dynamic access control list 104.

Over time new IP addresses may be assigned to particular DNS names and for proper operation of the switch. 102 the subprocess 202 must detect any such changes and properly update the dynamic access control list 104. This may be accomplished by the subprocess 202 occasionally sending reverse DNS lookup queries to the DNS server for each DNS name in the mapping state database 110 and detecting any changes. Another approach is to have the DNS server configured to automatically inform the subprocess 202 when a new IP address is assigned to a given DNS name, enabling the subprocess to update the dynamic access control list 104 as required.

The third subprocess executed by the switch 102 is the DHCP monitoring and MAC conversion subprocess 204, which converts MAC addresses into corresponding IP addresses. The subprocess 204 monitors DHCP return packets from a DHCP server, which corresponds to one of the hosts 106 (FIG. 1), and from these return packets determines the IP address assigned by the DHCP server to a given MAC address. Recall, in response to a request from a given host 106 the DHCP server assigns an IP addresses to that host from a pool of available IP addresses. Thus, the subprocess 204 need merely determine the assigned IP address contained in the return packet for the destination MAC address of the packet. The subprocess 204 stores a record of the IP address assigned to the MAC address in the mapping state database 110 and applies the rules of the enhanced access control list 108 to generate a corresponding record in the dynamic access control list 104.

**8**

If a prior IP address for the MAC address is already stored in the mapping state database 110, this record is deleted and updated with the new IP address and the dynamic access control list 104 updated accordingly. When MAC addresses are statically assigned to the hosts 106, the subprocess 204 monitors address resolution protocol (ARP) packets, where the ARP is a network protocol used to convert IP addresses into physical addresses such as Ethernet addresses, as will be understood by those skilled in the art. Each ARP packet will include the IP and MAC address of the host 106 sending the packet, and thus the subprocess 204 detects such packets to determine the IP address associated with each MAC address and updates the mapping state database 110 and dynamic access control list 104 accordingly. Alternatively, packets with new source IP addresses can be given to the CPU as was described in the DNS monitoring process. Through this method, the the IP and MAC address of the host 106 sending the packet is identified, and thus the subprocess 204 detects such packets to determine the IP address associated with each MAC address and updates the mapping state database 110 and dynamic access control list 104 accordingly

During operation of the switch 102, it is possible that different user names or MAC addresses may attempt to be mapped to the same IP address, which should not be allowed and would represent an error condition. For example, assume a given host 106 has a MAC address "123456-123456" and has been statically assigned an IP address of 192.168.0.1. Also assume there is a rule in the enhanced access control list 108 for the MAC address 123456-123456. If there is a separate rule contained in the enhanced access control list 108 for a user "John Doe" and John Doe logs into the network using the host 106 corresponding to the MAC address 123456-123456 then the user name and John Doe and the MAC address 123456-123456 will mapped to the same IP address. This may not be a problem, but if John Doe has different access privileges to resources in the network 100 then does the MAC address 123456-123456 then a conflict and thus an error condition exists. For example, the access privileges of John Doe may be more restrictive than those of the MAC address 123456-123456, and in this situation and John Doe should not be provided access to the network 100 with the less restrictive access privileges associated with the MAC address.

Such a conflict may be resolved by generating a "deny" record in the dynamic access control list 104 for this IP address so that no packets are communicated to or from the host 106 corresponding to the IP address. Alternatively, the rule first encountered in the enhanced access control list 108 could be applied, such that if the rule for MAC address 123456-123456 appears in the enhanced access control list prior to the rule for user name and John Doe, the rule for the MAC address is utilized. In this way, as long as levels of access privileges are taken into account when generating the enhanced access control list 108 such conflicts can be resolved without denying all packets to and from the corresponding host 106. Furthermore, either of the above approaches could also include sending an error notification to a system administrator to notify him or her of the conflict.

Over time, the IP address configuration changes will occur on the network 100. For example, the administrator may reconfigure the DHCP server to allocate a different pool of IP addresses, or the network administrator may reconfigure hosts 106 with new static IP addresses. The DHCP server may allocate a different address to a given user. These IP address configuration changes could appear as an error condition. To prevent this, stale data must be purged from the mapping state database 110, and the associated entries in the Dynamic ACL

US 7,623,518 B2

**9**

**104** should be deleted. Mapping state database **110** entries populated via DHCP monitoring are deleted after a DHCP lease time expires, or when DHCP packets are received from the DCHP server which give a previously allocated IP address to a new user. Mapping state database **110** entries populated via ARP monitoring or IP source address change monitoring are deleted after an administratively configured time. One day is a good default value for this timeout.

FIG. **3** is more detailed functional block diagram of the Ethernet switch **102** of FIG. **1** according to one embodiment of the present invention. The Ethernet switch **102** includes a switch forwarding engine **300** that examines Ethernet packets received on one of a plurality of ports P**1**-P**N** from a host (not shown) coupled to each port and forwards each received Ethernet packet to the proper host through the corresponding port. A processor **302** in the switch **102** programs the switch forwarding engine **300** to execute a desired set of rules to provide selected Ethernet packets received by the forwarding engine to the processor. The set of rules ensures that the processor **302** receives all packets necessary for the proper generation of the dynamic access control list **104** (FIG. **2**). In the embodiment of FIG. **3**, the switch forwarding engine **300** provides all IEEE 802.1x login packets, Windows domain login packets, packets having unknown source IP addresses, and DHCP packets as previously described to the processor **302** to enable the processor execute the process previously described with reference to FIG. **2**.

The switch **102** further includes a direct memory access (DMA) controller **304** that transfers the packets selected by the switch forwarding engine **300** to a packet memory **306**. The selected packets are stored in the packet memory **306** for processing by the processor **302**. Also stored in either the packet memory **306** or memory in the processor **302** is the enhanced access control list **108** (FIG. **2**) along with required programming instructions for execution by the processor to control the overall operation of the switch **102**. To store a selected packet from the switch forwarding engine **300**, the processor **302** programs required registers in the DMA controller **304**. The switch forwarding engine **300** then supplies the packet to the DMA controller **304** which, in turn, stores the packet in the packet memory **306**. The processor **302** accesses the stored packets in the packet memory **306** along with the stored enhanced access control list **108** (FIG. **2**) to generate the dynamic access control list **104** (FIG. **2**). After the processor **302** processes a given packet stored in the packet memory **306**, the packet may need to be provided to the intended destination host **106**. To forward a packet stored in the packet memory **306** to the intended destination host **106**, the processor **302** addresses the packet memory to access the desired packet and programs required registers in the DMA controller **304**. In response to being programmed, the DMA controller **304** reads the accessed packets from the packet memory **306** and supplies these packets to the switch forwarding engine **300** which, in turn, forwards the packets to the required destination host **106**.

One skilled in the art will understand that even though various embodiments and advantages of the present invention have been set forth in the foregoing description, the above disclosure is illustrative only, and changes may be made in detail, and yet remain within the broad principles of the invention. For example, many of the components described above may be implemented using either digital or analog circuitry, or a combination of both, and also, where appropriate, may be realized through software executing on suitable processing circuitry. One skilled in the art will also appreciate that the functions performed by the dynamic access control list **104**, enhanced access control list **108**, mapping state

**10**

database **110**, subprocesses **200**-**204**, and components **300**-**306** may be combined to be performed by fewer elements or divided out and performed by more elements, depending upon the specific application of the switch **102** and possibly other design considerations. Moreover, although the above embodiments have been described for the Ethernet network **100**, the concepts of principles of the present invention may be applied to other types of networks, as will be appreciated by those skilled in the art. Therefore, the present invention is to be limited only by the appended claims.

What is claimed is:

**1**. A method of developing an access control list, comprising:

developing an enhanced access control list including data related to at least one of user names, DNS names, Windows domain names, and physical addresses;

converting, in a network switch, at least one of:

user names into corresponding IP and physical addresses according to data in the enhanced access control list, wherein converting user names into corresponding IP and physical addresses according to data in the enhanced access control list includes:

detecting login packets being communicated over the network;

determining a MAC address from the login packets;

detecting server message block login packets being communicated over the network;

determining an IP address from the server message block login packets; and

developing records in the access control list using the obtained IP address for the respective user name;

DNS names into corresponding IP addresses according to data in the enhanced access control list; and

physical addresses into IP addresses according to data in the enhanced access control list; and

developing, in the network switch, the access control list from each of the operations of converting.

**2**. The method of claim **1** further comprising storing the user names and corresponding IP addresses in a mapping state database that defines current relationships among user names, DNS names, domain names, and physical addresses.

**3**. The method of claim **1** wherein each physical address comprises a MAC address.

**4**. The method of claim **1** wherein converting DNS names into corresponding IP addresses according to data in the enhanced access control list comprises:

detecting packets having an unknown source IP address;

generating a DNS name query using the source IP address;

receiving a DNS name associated with the IP address responsive to the query; and

developing records in the access control list using the obtained IP address for the respective DNS name.

**5**. The method of claim **4** further comprising occasionally generating new DNS name queries for the source IP address and thereafter repeating the operations of receiving and developing to update the access control list.

**6**. The method of claim **4** further comprising occasionally receiving the DNS name associated with the IP address and thereafter repeating the operation of developing to update the access control list.

**7**. The method of claim **1** wherein converting physical addresses into IP addresses according to data in the enhanced access control list comprises:

monitoring DHCP packets communicated over the network;

obtaining an IP address assigned to a particular physical address from the monitored DHCP packets; and

US 7,623,518 B2

11

developing records in the access control list using the obtained IP address assigned to a respective physical address.

**8**. A method of controlling access of a user to a network including a plurality of hosts coupled together through a network switch, the method comprising:

storing in the network switch an enhanced access control list containing data related to at least one of user names, DNS names, Windows domain names, and physical addresses; and

generating a dynamic access control list from the enhanced access control list, the dynamic access control list containing a plurality of IP addresses that restrict access of the user to the network, wherein generating the dynamic access control list comprises:

mapping user names to IP addresses, wherein mapping user names to IP addresses comprises:

detecting server message block login packets being communicated over the network; and

determining an IP address from the server message block login packets;

mapping user names to physical addresses;

mapping physical addresses to IP addresses;

mapping unknown IP addresses to physical addresses;

mapping unknown IP addresses to DNS names; and

applying rules set forth in the enhanced access control list relating to controlling access of a user to the addresses determined by the operations of mapping to generate the access control list.

**9**. The method of claim **8** wherein the physical addresses comprise MAC addresses.

**10**. The method of claim **8** wherein mapping user names to physical addresses comprises:

detecting login packets being communicated over the network; and

determining a MAC address from the login packets.

**11**. The method of claim **8** wherein mapping unknown IP addresses to DNS names comprises:

detecting packets having an unknown source IP address;

generating a DNS name query using the source IP address; and

receiving a DNS name associated with the IP address responsive to the query.

**12**. The method of claim **11** further comprising occasionally generating new DNS name queries for the source IP address and thereafter repeating the operations of generating and receiving.

**13**. The method of claim **8** wherein mapping unknown IP addresses to physical addresses comprises detecting packets having an unknown source IP address.

**14**. The method of claim **8** wherein mapping physical addresses to IP addresses comprises:

monitoring DHCP packets communicated over the network; and

obtaining an IP address assigned to a particular physical address from the monitored DHCP packets.

**15**. A network switching circuit, comprising:

a forwarding circuit operable to detect specific received packets and to provide the specific packets on a processor port, and further operable to receive packets on one of a plurality of ports including the processor port and to forward each received packet to a port corresponding to

12

a destination address contained in the packet subject to access restrictions contained in a dynamic access control list;

a memory circuit coupled to the forwarding circuit, the memory circuit operable to store packets and operable to store an enhanced access control list and a dynamic access control list; and

a processor coupled to the forwarding circuit and to the memory circuit, the processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets.

**16**. The network switch of claim **15** wherein the processor further comprises a direct memory access controller coupled between the forwarding engine and the memory.

**17**. The network switch of claim **15** wherein the switch comprises an Ethernet switch and wherein the packets comprise Ethernet packets.

**18**. The network switch of claim **15** wherein the enhanced access control list comprises user names, DNS names, Windows domain names, and physical addresses.

**19**. A computer network, comprising:

a network switch, including,

a forwarding circuit operable to detect specific received packets and to provide the specific packets on a processor port, and further operable to receive packets on one of a plurality of ports including the processor port and to forward each received packet to a port corresponding to a destination address contained in the packet subject to access restrictions contained in a dynamic access control list;

a memory circuit coupled to the forwarding circuit, the memory circuit operable to store packets and operable to store an enhanced access control list and a dynamic access control list; and

a processor coupled to the forwarding circuit and to the memory circuit, the processor operable to define the specific packets detected by the forwarding circuit and operable to process the specific packets stored in the memory circuit using the enhanced access control list to generate the dynamic access control list and store the dynamic access control list in the memory circuit, and further operable to provide the specific packets to the processor port of the forwarding circuit after processing the packets; and

a plurality of hosts, each host coupled to a respective port of the network switch.

**20**. The computer network of claim **19** wherein at least some of the hosts comprise personal computer systems.

**21**. The computer network of claim **19** wherein the network comprises an Ethernet network, and wherein the switch comprises an Ethernet switch and the packets comprise Ethernet packets.

**22**. The computer network of claim **19** wherein the enhanced access control list comprises user names, DNS names, Windows domain names, and physical addresses.

\*    \*    \*    \*    \*

# CERTIFICATE OF SERVICE

I certify that today, November 4, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system.

*/s/Brett Cooper*
Brett E. Cooper
*Counsel for Appellant Lionra*
*Technologies Ltd.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1), because this brief contains 3,172 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/Brett Cooper*
Brett E. Cooper
*Counsel for Appellant Lionra*
*Technologies Ltd.*